# IN THE COURT OF APPEALS OF IOWA

No. 21-1357
Filed December 15, 2021


**IN THE INTEREST OF T.M.,**
**Minor Child,**

**J.H., Intervenor,**
        Appellee.
_____


Appeal from the Iowa District Court for Muscatine County, Gary P. Strausser, District Associate Judge.


The State appeals the juvenile court's modification of a permanency order.
**AFFIRMED.**


Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellant State.

Sara Strain Linder of Bray and Klockau, Iowa City, for appellee intervenor.

Christopher J. Foster, Iowa City, attorney and guardian ad litem for minor child.


Considered by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

Three-year-old T.M. was removed from her mother's care and placed with her maternal aunt when she was just eight months old. She stayed there for the next nineteen months while her mother worked to conquer an addiction to methamphetamine. After a brief return to her mother's care, T.M. was removed again when her mother relapsed. This time, she was placed with the father of her two half-siblings. He became overwhelmed caring for all three children by himself, prompting the State to file a motion requesting that T.M. be placed in foster care. The juvenile court instead returned the child to the custody of her aunt. The State appeals, claiming it's better for T.M. to be in foster care than with her aunt because the aunt's husband was the subject of a founded report of child sexual abuse in 2013. We disagree and affirm the juvenile court's ruling.

## I.    *Background Facts and Proceedings*

T.M. was born in May 2018 with methamphetamine in her system. She was adjudicated as a child in need of assistance in September but was allowed to remain in her mother's custody with supervision from the Iowa Department of Human Services. A dispositional order continued this arrangement. But by early 2019, the department moved to modify T.M.'s placement because the mother was not responding to the services being offered to her.

The juvenile court granted the State's request in February 2019 and placed eight-month-old T.M. in the custody of her maternal aunt. Soon after T.M.'s placement there, the department reported that the maternal aunt

> and her husband . . . are taking very good care of [T.M.] [The aunt]
> works first shift as a teacher and her husband works third shift.
> Protective childcare is provided for [T.M.] while [the aunt] works and

> her husband sleeps.  They have her on a schedule now and she is thriving.  They reside in a large home that meets the needs of their family as well as [T.M.]  The couple has 3 children, all older than [T.M.]
>
> . . . .
>
> [They] have done a terrific job stepping up and providing her with a safe, stable home.  There is structure and consistency in her life now.  This is important to everyone, but especially for children.

After this initial positive report, the department learned that the aunt's husband had a "founded child abuse report from 2013 for sexual abuse because of indecent contact with a child."  That report is not part of the record before us.  But according to the department's case manager, it involved a seventeen-year-old girl who alleged that the aunt's husband gave her alcohol, asked her to send him a picture of her breasts, and sent her a picture of his crotch area.  The aunt and her husband were interviewed during the department's investigation of the allegations, which they denied, but they never received a copy of the founded report because they had moved to a different address before it was completed.  No criminal charges were ever filed against the husband.

Despite discovering this report, the department allowed T.M. to remain in her aunt's care subject to a safety plan that prohibited the aunt's husband from being alone with T.M.  Early on after that plan was implemented, the department became aware that the aunt left T.M. alone with her husband while the aunt took a shower.  On another occasion, she let one of her children "supervise" her husband and T.M.  The department addressed these concerns with the aunt, and no further violations of the plan occurred.  Indeed, in later reports to the court, the department stated that T.M. "has done well in [the aunt's] home, and there are no current safety concerns for her."

A permanency order was entered in February 2020, continuing T.M. in her aunt's custody under the department's supervision. The permanency goal was reunification with the mother, who was given six additional months to work toward that goal. At the end of those six months, the juvenile court found the mother was ready to resume custody of T.M. because of her sustained sobriety and positive response to services. Sadly, the mother relapsed in January 2021, and T.M. was again removed from her care in March.

This time, T.M. was placed with the father of her two half-siblings rather than back with her aunt. The aunt petitioned to intervene in the juvenile proceedings and requested that T.M. be placed with her under Iowa Code section 232.102(1)(a)(1) (2021). At a hearing on her requests, the aunt testified that although she and her husband disagreed with the conclusions in the 2013 founded child abuse report, her husband was scheduled to complete a psychosexual evaluation in July. The department's case manager was asked on cross-examination whether she would give weight to the therapist's findings. She replied: "I think if [the therapist] had access to all the information, including the founded child abuse report when she did her evaluation, then, yes, I would find that that evaluation had merit to it." But she clarified that she would still resist T.M.'s placement with the aunt and her husband because even if "he's low risk [that] doesn't mean there isn't risk, and I think that we would be remiss to make the decision to place [T.M.] in that home hoping he doesn't abuse her." She also believed it was best for T.M. to be placed with her half-siblings.

Several months passed with no ruling from the juvenile court, during which time T.M. continued to reside with her half-siblings' father. In August 2021, the

aunt moved to reopen the record so that the court could consider the psychosexual evaluation of her husband. After interviewing the aunt's husband, reviewing the founded report, and administering several tests, the therapist concluded, "[The husband] does not exhibit characteristics, behaviors, or symptomology typical of adults who sexually abuse children. [He] presents as low risk for engaging in sexually offending behaviors." As support for this conclusion, the therapist noted:

> [The aunt's husband] has maintained steady employment all his adult life. He is financially stable and able to provide for his family. [He] is able to engage in and has appropriate social interactions, and has a pattern of long-term friendships and relationships. [He] has lived and participated in friends and community events for more than 16 years. [He] does not present with a history of poor self-regulation or impulse control. He does not have a history of mental illness, domestic violence, or behavioral disorders. [He] does not abuse nor is he dependent on alcohol or illicit drugs. [He] does not exhibit distorted thought patterns suggestive of adult to child sexual abuse. He does not verbalize o[r] report negative attitudes towards women. Interview information provides that [he] denies use of pornography, and denies any exposure to violent pornography. [He] has not been convicted of any sexual offense during his adolescent or adult life. During the past 7 years and 8 months of his placement on the DHS Registry, [he] has not engaged in or been investigated by DHS or law enforcement for engaging in any child sexual or physical abuse. [He] has proven himself successful and trustworthy as a parent and caregiver to children. He raised his young son alone for four years, and then provides care for a stepson and a second biological son. [He] reports he is and always has been an active parent, involved in all aspects of childcare and support. [He] has proven himself trustworthy as a foster parent. He safely care[d] for his niece for 19 months, and follows all safety measures set forth by Department of Human Services. [He] continues to verbally express a desire to provide a home for his niece, and wishes to adopt if the situation warrants.

A month later, the State filed its own motion to modify T.M.'s placement because the father of her half-siblings could no longer care for her. The State requested T.M. be placed in foster care. T.M.'s mother and guardian ad litem opposed this request, instead advocating for T.M. to be placed back with the aunt

and her family.  The same day, the juvenile court entered an order placing T.M. in her aunt's custody under the department's supervision.  The State filed a motion to reconsider, which was summarily denied.  The State appeals, challenging only the juvenile court's decision to place T.M. with the aunt.[1]

## II.      Scope and Standards of Review

We conduct a de novo review of a juvenile court's decision to modify a permanency order.  *In re T.O.*, No. 12-1532, 2012 WL 5954171, at *2 (Iowa Ct. App. Nov. 29, 2012).  "We examine the entire record and adjudicate anew rights on the issues properly presented."  *Id.*

## III.     Analysis

A permanency order can be modified under Iowa Code section 232.104(8)(a).  *Id.* at *3.

> [O]ur responsibility in a modification of a permanency order is to look solely at the best interests of the children for whom the permanency order was previously entered.  Part of that focus may be on parental change, but the overwhelming bulk of the focus is on the children and their needs.

*In re A.S.T.*, 508 N.W.2d 735, 737 (Iowa Ct. App. 1993).[2]

The State argues it was in T.M.'s best interests to be placed in foster care because (1) the aunt cannot assure her "short-term safety" based on the "clear

---

[1] The State does not contest the juvenile court's failure to hold a hearing on its motion, the aunt's ability to participate in the juvenile proceedings without her petition to intervene being granted, or the court's lack of findings to support its ruling.  So we will not address those issues further in our review.

[2] Some of our cases have required the party seeking modification to show a substantial change in material circumstances, while others have concluded that showing is no longer required because of a statutory amendment.  *See In re E.G.*, No. 17-1855, 2018 WL 540995, at *2 n.4 (Iowa Ct. App. Jan. 24, 2018) (collecting cases).  We need not decide this issue because neither party challenges whether there was a change in circumstances.

risk" her husband poses "to any children in the home"; and (2) the aunt and her husband "will not be approved as a concurrent plan home through [the department] given her husband's sexual abuse history."

In support of its first argument, the State contends that the aunt's "husband has a history of sexual offending behavior, he is unwilling to take accountability for or seek treatment for his offending behavior, and [the aunt] is unwilling to believe the prior abuse occurred." This "history" is limited to one offense in 2013 with a seventeen-year-old girl. We do not diminish the seriousness of that offense, but we agree with the psychosexual evaluator that the lack of other offenses since then is significant in examining the current risk presented by the aunt's husband. See State v. Chapman, 944 N.W.2d 864, 879 (Iowa 2020) (Appel, J., concurring) (discussing a study that noted 97.5% of low-risk offenders remain offense free after five years, and 95% remain offense free after fifteen years).

We also find it difficult to square the State's position that T.M. is now unsafe in her aunt's care with its decision to leave her in that placement for more than a year after it discovered the founded report. While there were two early breaches of the safety plan, they were quickly remedied once addressed with the aunt. And during T.M.'s time in her aunt's care, the department consistently reported that she was safe and doing well.

This case is thus unlike In re D.D., 955 N.W.2d 186 (Iowa 2021), which the State cites in support of its argument that "[c]hildren are not safe when left in the care of sex abusers who have not taken accountability for and sought treatment for their offending behavior." The court in D.D. was reviewing a juvenile court decision to allow a child to remain living with her step-father, who sexually abused

her and her siblings over an extended period of time. 955 N.W.2d at 192. The child had suicidal thoughts, exhibited poor behavior at school, and had trouble sleeping while residing in the same home as her abuser. *Id.* at 193. Here, by all accounts, T.M. was thriving in her aunt's care. In addition, while the aunt and her husband denied the allegations supporting the founded report, the husband sought treatment, although none was recommended.

As for the State's second argument about the aunt's inability to be approved as a concurrent plan home, we note the permanency goal is still reunification with T.M.'s mother. If reunification fails, the aunt could request custody and guardianship of T.M. under section 232.117(3)(c) and proceed with a direct adoption. The State asserts that possibility places T.M. at greater risk because she "would be left to grow from a toddler into a young woman in the home of her aunt and uncle without even the limited protections that can be provided by [the department's] supervision and safety planning." But as the aunt points out, T.M. safely resided with her and her husband for nineteen months under the department's supervision, which will continue until at least March 2022 when the next permanency review hearing is scheduled. *See* Iowa Code § 232.104(8)(a); *see also In re T.D.*, No. 07-0485, 2007 WL 2119018, at *5 (Iowa Ct. App. July 25, 2007) (considering continued supervision by the department when examining the child's best interest).

"A stable, loving homelife is essential to a child's physical, emotional, and spiritual well-being." *In re P.L.*, 778 N.W.2d 33, 38 (Iowa 2010) (citation omitted). As the aunt explained:

[T.M.] and I have a bond. She's bonded with our family. She came to live with us when she was eight-and-a-half months old. I don't wanna say we have a mother-daughter relationship, because I'm not her mom, but we definitely have a bond. She was with me for almost nineteen months, and she's almost three. And nineteen months is the longest consecutive place that she's lived, and that's been here.

"[C]hildren who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens. The same can be said of children who, though not physically or emotionally abused, are passed from one foster home to another with no constancy of love, trust, or discipline." *Id.* (citation omitted). We wish that we had a crystal ball so that we could determine what the future holds for T.M. But when we weigh the documented low risk presented by the aunt's husband against the harm of moving this young child into a stranger's home, we agree with the juvenile court's decision to place T.M. in the custody of her aunt subject to the department's supervision. *See In re N.M.*, 528 N.W.2d 94, 97 (Iowa 1995) (noting chapter 232 "favors relative placements over nonrelative placements"). We thus affirm the modification of the permanency order.

**AFFIRMED**.